

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 14-06-GF-DLC |
| Plaintiff/Respondent, | CV 15-81-GF-DLC |
| vs. | ORDER DENYING § 2255 MOTION |
| DAVID J. LEWIS, | AND DENYING CERTIFICATE OF |
| Defendant/Movant. | APPEALABILITY |

This case comes before the Court on Defendant/Movant David J. Lewis's

motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255.

Lewis is a federal prisoner proceeding pro se.

Three of Lewis's claims have been denied for lack of merit. The United

States responded to these claims. It also filed and served on Lewis the pretrial

discovery produced to defense counsel. *See* Order (Doc. 67) at 12 ¶ 2; Notice

(Doc. 76). Since then, Lewis has filed a reply to the answer, two supplements, and

a motion for counsel. Although he previously rejected the Court's offer to appoint

new counsel to represent him, *see* Orders and Responses (Docs. 61-66), he also

filed a motion for the appointment of counsel after the United States filed its

answer and the discovery. *See* Mot. for Counsel (Doc. 80).

1

The Court has reviewed all the materials in the file as well as the discovery[1] and is prepared to rule on the remaining claims as well as the motion for counsel.

## I. Background

Lewis was arrested on January 11, 2014, when he confessed to killing 21-year-old Armon Boyd. On February 5, 2014, a grand jury indicted Lewis on one count of first-degree murder (Count 1) and one count of second-degree murder (Count 2), both violations of 18 U.S.C. § 1111(a). Jurisdiction was predicated on the Major Crimes Act. *See* 18 U.S.C. § 1153(a); Indictment (Doc. 11) at 2. If convicted on Count 1, Lewis faced a mandatory sentence of life in prison. *See* 18 U.S.C. § 1111(b). If convicted on Count 2, Lewis faced a sentence of "any term of years or life." *Id.* Chief Federal Defender Anthony Gallagher was appointed to represent Lewis. *See* Order (Doc. 7).

On April 28, 2014, the parties filed a fully-executed plea agreement. Lewis agreed to plead guilty to Count 2, second-degree murder. In exchange, the United States agreed to dismiss the charge of first-degree murder in Count 1. The United States also conditionally agreed to seek a three-level reduction in Lewis's offense level under the Sentencing Guidelines to reflect his acceptance of responsibility. Both parties waived their rights to appeal the sentence if it fell within the

---

[1] References to the discovery omit a disc number because audio and video materials are uploaded to an internal computer network drive. Folder names are provided instead.

applicable guideline range. *See* Plea Agreement (Doc. 39) at 2 ¶ 2, 7 ¶ 6, 7-8 ¶ 8.

On May 2, 2014, at the change of plea hearing, Lewis agreed he had previously told a law enforcement officer that he had not at any time been afraid of Boyd, but he said his previous statement was incorrect. He explained that he was afraid at the outset of the altercation, but his fear dissipated and he was no longer afraid at the time he actually killed Boyd. He agreed with the other statements in the United States' Offer of Proof. *See* Offer of Proof (Doc. 40) at 3-4. At the conclusion of the hearing, Lewis pled guilty in open court to Count 2 of the Indictment.

A presentence report was prepared. The total offense level was 35. With a criminal history category of I, Lewis's advisory guideline range was 168 to 210 months. Lewis was sentenced to serve 210 months in prison, to be followed by a five-year term of supervised release. *See* Minutes (Doc. 48); Judgment (Doc. 49) at 2-3; Statement of Reasons (Doc. 50) at 1 ¶ III.

Lewis did not appeal. His conviction became final on September 30, 2014. *See Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012). He timely filed his § 2255 motion on September 18, 2015. *See* 28 U.S.C. § 2255(f)(1).

## II. Remaining Claims

Three claims remain pending:

Claim 1    Counsel provided ineffective assistance because he did not correctly understand the events leading to Lewis's arrest and

refused to move to withdraw Lewis's plea or to obtain new counsel for Lewis. *See* Mot. § 2255 (Doc. 55) at 1-2 ¶¶ 1-3; Br. in Supp. (Doc. 58) at 2-5;[2] Supp. (Doc. 78) at 1-2.

Claim 3 Counsel did not do any pre-trial investigation and, if he had, "we would have known that a conflict between [Boyd's] brothers and myself happened on April 26, 2011," resulting in serious and potentially life-threatening injuries to Lewis, and that in 2012 Boyd twice kicked in the back door to someone else's home. *See* Br. in Supp. at 2-3; Supp. (Doc. 79) at 2; Supp. (Doc. 81) at 1-2.

Claim 5 Lewis pled guilty because counsel told him that if he went to trial, the prosecutor would indict Lewis's sister, Pauline, on a charge of aiding and abetting. Counsel told Lewis at the change of plea hearing to "remember" that Pauline was threatened but Lewis himself was not. Later, Lewis learned the supposed threat "was not true." *See* Mot. § 2255 at 3-4 ¶ C; Br. in Supp. at 4-5; Reply (Doc. 78) at 1.

### III. Factual Background

The course and content of the investigation is relevant to Lewis's claims. Investigative reports are the raw materials of the prosecution's case. Even if the reports do not accurately reflect the defendant's version of events, they show what witnesses and evidence the government likely would have presented to prove the case at trial and, therefore, what defense counsel had to be prepared to meet.

### A. Investigation of Missing Person Report

At about 6:30 p.m. on Friday, January 10, 2014, Officer Jay Brugh of the

---

[2] Documents 57 and 58 appear to be identical briefs in support of the motion, but Document 57 is not signed. Lewis signed Document 58. Document 57 will be disregarded.

Brockton city police asked Fort Peck Tribal Officer Doyle Bets His Medicine to

help him investigate a report that 21-year-old Armon "Poohz" Boyd was missing.

Brugh had spoken with Lewis, who told him that Boyd had been at his house on

Thursday night but left when he got a text message from Tracy Yellow Hammer.

Yellow Hammer said she did not text Boyd on Thursday night and had not heard

from him for a few days. Bets His Medicine talked to a few more residents on

First Street without getting anywhere. At 8:30 p.m., he returned to Poplar and

contacted his lieutenant, Frank Martell, to advise him of the situation. *See* Bets His

Medicine Report, Bates 231.[3]

Around 9:00 a.m. on Saturday morning, January 11, 2014, Roosevelt County

Deputy Tim Lingle traveled to Brockton to resume the investigation. Tribal police

also became involved. Arletta Black Dog, Boyd's grandmother, told Lingle she

had last seen Boyd around 10 p.m. on Thursday night, January 9. She added that

Lewis had called her and told her Boyd was being stalked by someone. *See* Lingle

Report, Bates 244; Trottier Report, Bates at 40; Lingle Report, Bates 2246.

After talking to Black Dog, Lingle went to see Lewis at his residence on

First Street.[4] Lewis let him in, and they sat at the kitchen table. Lingle noticed a

strong "air freshener" type of smell. Lewis said Boyd visited him on Thursday

---

[3] "Bates" refers to the Bates stamp number at the bottom of each page provided in discovery in PDF form. *See* Order (Doc. 67) at 12 ¶ 2.

[4] About 260 people live in Brockton. *See* Fed. R. Evid. 201.

night and asked to borrow some money to get a marijuana cigarette and go to a game on Friday. Boyd also told Lewis someone was stalking him but said he was not worried about him or them. Lewis said Boyd left at 11:20 p.m. He said Vangie Ramsay told him Boyd came to her house around 1:00 a.m. on Friday. *See* Lingle Report, Bates at 244-45.

Lingle went to see Ramsay, who lived a few houses away on First Street. She confirmed that Boyd was there at about 1:00 a.m. on Friday morning. Her boyfriend, Del Ray Smith, said Boyd asked to buy a marijuana cigarette and was not dressed like someone who intended to be outdoors long. Ramsay said Myron Spotted Bird told her Boyd called him at 1:36 a.m. on Friday. Ramsay also thought Tracy Yellow Hammer got a text from Boyd around 11:00 Friday morning. *See id.* at 245; *see also* FBI 302 re: Smith, Bates 662.

Lingle contacted Yellow Hammer. She said she got a text from Boyd on Thursday, not Friday, and had not heard from him since. *See* Lingle Report, Bates 245; 1-11-14 Interviews, WS700159 at 1:24-1:33, 3:06-3:30, 4:18-4:35; *see also* Overby Report, Bates 1156 (requesting enhancement of Lingle recordings).

Lingle also spoke to Myron Spotted Bird, who confirmed a phone call from Boyd at 1:33 a.m. on Friday. Boyd had asked where Spotted Bird was. Spotted Bird told Boyd he was playing whist at Lori Big Talk's residence. Boyd told Spotted Bird he would be right there, but he did not show up. Both Myron and

6

Leland Spotted Bird told Lingle Lewis had a violent past and they suspected he had something to do with Boyd's disappearance. *See* Lingle Report at 245-46.

Based on these interviews, Lingle decided to ask Lewis and Ramsay if they would allow him to search their homes for Boyd. Up to this point, Lewis had been talking with his neighbors about Boyd's whereabouts and expressing concern about him. *See, e.g.,* FBI 302 re: Yellow Hammer, Bates 19; FBI 302 re: Gray Hawk, Bates 21; FBI 302 re: Black Dog, Bates 455; Lingle Report, Bates 244-45; *see also, e.g.,* SMS Text and Toll Records, Toll_Data, lines 152-179 (calls between Lewis and Boyd's friends and family). But when Lingle asked him to allow a search of his house, Lewis declined. He said, "I got stuff in there that's illegal." Lingle assured Lewis he was only interested in Boyd and would not charge Lewis for anything else, such as marijuana or methamphetamine. Lewis still declined and told Lingle he would need a search warrant. Bets His Medicine also asked Lewis whether he would consent to a search, and Lewis turned him down as well. *See* 1-11-14 Interviews, WS700159 at 4:30-7:20; Lingle Report at Bates 246; Bets His Medicine Report, Bates 232; *see also* Trottier Report at Bates 40.

## B. Lewis's Statement to Martell

At that point, Lieutenant Martell of the Fort Peck Tribal Police approached Lewis. According to Martell, he told Lewis that rumors Lewis had a role in Boyd's disappearance would stop if he permitted a search of his house. Lewis then

looked around at the neighborhood people watching the police activity. Lewis asked Martell if he could come in so they could talk. Martell agreed. They sat down at the kitchen table. *See* Martell Report, Bates 240; *see also* Bets His Medicine Report, Bates 232-33.

Lewis told Martell that Boyd had left his house at about 8:00 p.m. but returned at about 4:00 a.m. and knocked on the door. When Lewis opened it, Boyd pushed his way inside and struck Lewis in the face. Lewis described himself as too drunk to fight back. He said, "I killed him." When Martell asked Lewis whether he was defending himself, Lewis paused but did not answer. He said the two of them fought in the living room and into the kitchen. Lewis grabbed a knife and started swinging it and Boyd was not moving. Martell advised Lewis of his tribal rights and handcuffed him. *See* Martell Report, Bates 240-41.

Lewis said a friend from Poplar came to his house twice, told him they should hide the body, and tried to cut Boyd's arm off the second time he was there, but Lewis stopped him. Lewis told Martell that the knife was in the second drawer of the white dresser in the first bedroom. Martell asked where Boyd was. Lewis gestured with his head toward the bedroom area of the house. When Lewis's sister Pauline arrived and came into the kitchen with Lewis and Martell, Lewis said to her, "I killed Poohz." *See id.* at 241; Bets His Medicine Report, Bates 233.

Martell asked Officer Bets His Medicine to stay with Lewis and Pauline and

went to the first bedroom. He found the knife, but Boyd was not there. Martell asked Lewis again where Boyd was, and Lewis said he was in the last bedroom on the right. Martell looked in the room and saw a body under a blanket, with hands and feet protruding. Martell then called Trottier and told him Lewis had confessed to killing Boyd. Trottier notified Agent Golob at the FBI. *See* Martell Report, Bates 241; Trottier Report, Bates 41.

Meanwhile, Lewis told Bets His Medicine that he let Boyd into his house at about 3:45 a.m., was struck in the face, grabbed a knife in the ensuing fight and swung it down on Boyd's chest several times. *See* Bets His Medicine Report, Bates 234.

### C. Lewis's First Recorded Interview

At 3:03 p.m., Golob and Trottier recorded an interview with Lewis at the tribal jail in Poplar. *See generally* First Lewis Interview Jan. 11, 2014, WS_10001. Lewis was advised of his rights. He waived them and agreed to talk. *See id.* at 0:20-4:10.

#### 1. The Fight

Lewis explained that he and Boyd had been seeing each other, off and on, since February 2011. *See* First Interview at 21:25-23:00. They were both drinking at Lewis's house on Thursday night. Boyd was drunk, which always made him talk about his mother and tell the same stories and say the same things over and

over. Lewis told Boyd he needed to grow up and learn to let it go. Boyd got upset and left at 11:20 p.m. *See id.* at 5:05-6:45.

Lewis continued drinking. He sat at his computer listening to music and was going to bed when he heard a knock at the door. Lewis checked his phone and noted it was 3:46 a.m. on Friday, January 10. Boyd was at the door. When Lewis let him in, Boyd punched him and kicked him, knocking him down and bruising his chest. The two fought their way into the kitchen. Lewis said he saw a black-handled kitchen knife on the counter by the back door, grabbed it when Boyd kneed him in the chin, and told him to "behave." Boyd tried to knee Lewis again, and Lewis started to swing the knife. He said he and Boyd were laying on their sides and facing each other. He did not know how many times he swung but thought he stabbed Boyd in the back, holding the knife like an ice pick rather than a hammer. Lewis got away and went to his bedroom. He sat there for a little bit and then returned to the kitchen. Boyd was laying on his stomach by the back door, not moving. Lewis sat down for about an hour. He tried to go to sleep but could not. He dragged Boyd into the laundry room and sat down again at the kitchen table. Lewis said he did not see a lot of blood in the kitchen but did see a lot in the laundry room after he moved Boyd. Lewis also said Boyd started making a wheezing noise when Lewis moved him, but he did not think Boyd was alive. He thought about calling the police but could not believe what had happened. *See*

First Interview at 6:45-13:00.

### 2. The Man and the Clean-Up

Lewis said a man came to his house about 8:30 Friday morning, because Lewis was supposed to go to Sydney to "buy him some stuff." Lewis refused to identify the man. The man left, came a second time, left again, and came again a third time after dark, leaving for good when Lewis would not let him in, all on Friday. Lewis claimed this man urged him to "get rid of" Boyd's body, dragged Boyd's body to the back bedroom, and started trying to dismember it. Lewis claimed he stopped the man and also said he was afraid the man would kill Lewis's family if he revealed his name. Lewis said the man told him to at least clean up the blood because it would "start to rot." *See* First Interview at 13:00-20:05.

Lewis said he did not clean up the blood until Saturday morning. He said he used soap and water, washed the towels he used in cleaning up, and washed Boyd's clothes "because they were starting to stink." He clarified that he and the man had removed Boyd's clothes the second time the man came to Lewis's house (that is, sometime during the day on Friday). Lewis then said he did not know why he washed Boyd's clothes. *See id.* at 20:05-21:05.

### 3. Self-Defense

Asked whether there was a self-defense issue, Lewis said, "Yeah, kind of." But he said he did not fear that Boyd was going to kill him or seriously injure him.

At least three times, he said he "overreacted." *See* First Interview at 24:08-24:28, 25:49-26:15, 27:21-27:27, 27:55-28:00.

Lewis had abrasions on his elbows and knees and bruises on his rib and chest that he said were caused by his fight with Boyd. *See id.* at 33:40-34:23; Photo Log & Photos (PDF), Fort Peck Adult Detention Facility, Bates 84-99; IMG_2151.JPG to IMG_2163.JPG (photographs taken after interview). After Trottier photographed Lewis's injuries, the interview concluded at 4:04 p.m.

### D. Lewis's Second Recorded Interview

About six hours later, at 10:10 p.m., Golob and Trottier did a second, shorter interview with Lewis. *See generally* Second Lewis Interview Jan. 11, 2014, WS_10002. Lewis was Mirandized again and again waived his rights and agreed to talk. He answered some follow-up questions about his Indian status, Boyd's clothes and his own, the cleaning supplies he used, his own phone and Boyd's, and a physical altercation with Boyd the previous December. Lewis said that altercation also started because Boyd was drunk and talking about his mother. *See* Second Interview at 13:55-14:16. Lewis told the agents he had downed eight Gabapentin pills in 20 minutes before he was arrested to help himself calm down. He explained that he was dizzy and his heart was racing but said, "I'm okay. I know what I'm doing." *See id.* at 11:40-13:55.

For the first time, Lewis claimed to have had a TracFone for "a long time"

12

and said he used it to contact "the man" from Poplar who came to his house at 8:30

Friday morning. He said he broke the phone with a ten-pound hand weight at

about 10:30 that morning to avoid getting "him" involved. Lewis told the agents

that "the man" was not from Poplar but Seattle. *See id.* at 16:50-18:40, 22:26-

26:40; *see also* Bets His Medicine Report, Bates 234. (Lewis had lived in Seattle

from 1985 to 1995 and from 2004 to 2005. *See id.* at 4:05-4:34.) Trottier said,

"You panicked, didn't you, David?" After a pause, Lewis said, "Yeah, I did. But

there was somebody else there." *Id.* at 30:53-31:25. Lewis eventually said he

would talk to a lawyer about it, and if the lawyer thought it was best, then Lewis

would tell them the name. Trottier said that sounded fair, but the investigation

would not stop, and agents would obtain information from Lewis's and Boyd's

phones. Lewis said he did not text or call anyone. The interview ended at 10:44

p.m. *See id.* at 32:50-33:57.

### E. Lewis's Phone Calls

Phone records showed that Lewis had or attempted five conversations by

text on Friday and Saturday, January 10 and 11, 2014, including three directed to

Boyd's number. *See* SMS Text and Toll Records, SMS Records, lines 534-564. In

the same period, Lewis also made or received 45 "toll" calls, apparently meaning

voice calls, including two one-minute calls to Boyd's number on Friday evening

around 8:00. *See* SMS Text and Toll Records, Toll_Data, lines 145-189. Before

5:30 p.m. on Friday evening, Lewis's seven voice calls involved only a friend in Seattle, his sister Pauline, and her son, Marques Brown, in Billings. *See* SMS Text and Toll Records, Toll_Data, lines 145-151; FBI 302 re: Ortega, Bates 665; P. Lewis, Bates 25; Trottier Report re: Brown, Bates 656.

Lewis called a friend in Seattle, Michael "Frejo" Ortega, on Friday morning, January 10, at 2:58 a.m., again at 9:26 a.m., and twice on Saturday, January 11, at 1:17 p.m. The first three calls were less than one minute. The fourth was about three minutes. *See* SMS Text and Toll Records, Toll_Data, lines 145-146, 187-188; *see also* Golob Report re: Phone Records, Bates 692, 699, 708. An agent interviewed Ortega and his girlfriend, Yolanda, on February 20, 2014. Yolanda said she spoke with Lewis because Ortega was ill. Lewis told her he had just had a fight with his "son" and killed him. Ortega said he assumed Lewis was just drunk. Both Ortega and Yolanda said they had not spoken to Lewis since then. Ortega said he was last in Montana in 1989.[5] *See* Turner Report, Bates at 665-66; Recorded Interview Feb. 20, 2014, 801_0032 at 3:25-6:30, 7:50-8:35, 9:10-11:50; *see also* FBI 302 re: M. Spotted Bird, Bates 625 (Lewis told Boyd he reminded

---

[5] Investigators showed Ortega's picture to some people in Lewis's neighborhood. One person thought Lewis had brought him over from Seattle one time, and another thought he looked familiar but could not place him. Neither of them suggested they had seen Ortega recently. No one else recognized him. *See, e.g.*, FBI 302 re: A.L. Black Dog, Bates 449; J. Johnson, Bates 452; A. Black Dog, Bates 453; A.B. Black Dog, Bates 455; B. Rattling Thunder, Bates 469.

him of his son in Seattle).

Phone records also showed that Lewis called his sister Pauline's son, Marques, at 9:37 a.m. on January 10, 2014. *See* Trottier Report re: Brown, Bates 656; Burns Report, Bates 648, 1165. Marques did not pick up because he was sleeping, but he called Lewis back a short while later. Lewis asked Marques what he was doing. Marques said he had to work and would call back later. That call lasted about three minutes. Marques did not call back and thought it was odd Lewis called him because he never called. *See* Trottier Report re: Brown, Bates 656.

Lewis's sister Pauline told Officer Bets His Medicine that she had not stayed at Lewis's house for a while and had her own place. *See* Bets His Medicine Report at 233. Lewis told Bets His Medicine she was staying at the house. *See id.* at 232. Pauline said she was at Lewis's house on Thursday night. *See* FBI 302 re: P. Lewis, Bates 25. Phone records showed she texted Lewis shortly after 10:00 a.m. on Friday morning. Lewis told her he was "[a]t the clinic" and would contact her later. At 10:11 a.m., Pauline responded, "Ok." *See* SMS Records, lines 534-547. At 11:36 a.m., Lewis called Pauline. That call lasted two minutes. Pauline called Lewis at 12:15 p.m. and again at 5:02 p.m., both one-minute calls. *See* Toll_Data, lines 149-151, 166, 175, 182, 183, 185, 186, 189. Lewis also received calls from his sister Lois's phone number at 10:29 a.m. on January 11, lasting for 11 minutes,

again at 12:15 for five minutes, and again at 12:43 p.m. for one minute. *See* Toll_Data, lines 178, 180, 184; FBI 302 re: Blount, Bates 24. Lewis's brother Kurt declined to be interviewed. *See* FBI 302 re: K. Lewis, Bates 468.

### F. Boyd's Autopsy

A forensic pathologist, Dr. Thomas Bennett, examined Boyd's body. He found that Boyd died as a result of stab wounds causing a "massive" loss of blood into the thoracic cavity. *See* Final Bennett Report, Bates 1186. Dr. Bennett also noted a fresh contusion under Boyd's scalp, about 1½ inches in diameter, in the upper right frontoparietal region. The skin was not broken. He believed it likely occurred when Boyd fell as a result of his stab wounds but could have occurred up to a day before Boyd's death. There was no evidence of sexual activity. *See id.* at 1191, 1194.

Dr. Bennett identified 19 stab wounds. He labeled them alphabetically, not meaning to imply an opinion as to the order in which they were inflicted. Wound A was the only wound inflicted in the front of the body. The blade entered the *left* upper shoulder and penetrated backward, downward, and medially to the right (that is, toward the center of the body viewed from the front) to a depth of about 3 inches, penetrating the outer chest wall but not the chest cavity. *See id.* at 1187, 1193. Wounds B, C, and D were inflicted in the back of the *right* arm, with D perforating the skin on the back of the arm. These three wounds were directed

backwards, upwards, and medially to the left (that is, toward the center of the body viewed from the back). *See id.* at 1187, 1193.

Fifteen more stab wounds, E through S, were inflicted in Boyd's back, most to the left of his spine but a few to the right. Wounds O and P reached a depth of about 4 inches and corresponded to a perforating stab wound in the ascending aorta. Dr. Bennett connected these wounds with the injury to the heart and the blood in the left chest cavity. *See* Bennett Report, Bates 1187, 1190, 1193.

Wound I penetrated the left lung, entering in the left mid-back and passing forward more than 6 inches into the chest, collapsing the lung and cutting cleanly through the left second rib. *See id.* at 1187, 1190. Wound J penetrated into the left chest but did not strike the lung, indicating that the lung had already deflated. *See id.* at 1187, 1193. Wound S entered the right side of the back and penetrated the upper lobe of the right lung. *See id.* at 1187, 1191. All the other wounds penetrated into the chest wall, but none struck vital organs. *See id.* at 1187, 1194.

Boyd's blood-alcohol concentration at the time of his death was 0.357%. He had also used marijuana. *See* Toxicology Report, Bates 1195. Dr. Bennett opined that Boyd's alcohol intoxication would have "significantly impaired his ability to defend himself." Final Bennett Report, Bates 1194. Boyd would have been conscious and able to move for about two to four minutes after receiving the fatal wounds. *See* FBI 302 re: Bennett, Bates 46.

### G. Trace Evidence

Two swabs of what appeared to be blood spatter in the laundry room were found to be Boyd's blood. His blood or tissue was also found on the knife believed to be the murder weapon, on a circular saw, and on a carpenter saw. Two swabs of what appeared to be blood were taken from the southwest bedroom, where Boyd's body was found. They were not blood. Five swabs of what appeared to be blood spatter were taken from the kitchen. None were blood. *See* Smith Report, Bates 1221-22; *see also* Lingle Report, Bates 247.

DNA tests and trace evidence analysis did not point to significant involvement by a third, unidentified person. *See* Forensic Reports, Bates 1221-22, 1224, 1229-31, 1240-46.

## IV. Analysis

### A. Claims 1 and 3

Lewis contends that counsel should have investigated more and should have moved to withdraw Lewis's guilty plea. He asserts that counsel could have pursued a claim of self-defense or a lesser included offense, based on a fight between Boyd's brothers and Lewis in late April 2011 and Boyd's kicking in a door at another person's house on two occasions in 2012. *See* Br. in Supp. (Doc. 58) at 2-3. Since receiving the discovery produced to defense counsel, Lewis has claimed that counsel should have determined where Boyd was between the time he

18

left Vangie Ramsay's house and the time he returned to Lewis's house. He also seems to suggest that Boyd might have had someone else with him when he returned and that this person and/or Boyd must have had at least one and possibly two knives.

The materials now before the Court show why it was not worthwhile for counsel to pursue such allegations.[6] Lewis could claim self-defense if he reasonably believed it was necessary for him to use force and if he used no more force than appeared reasonably necessary under the circumstances. *See* 9th Cir. Crim. Jury Instr. No. 6.8. Lewis could obtain a lesser-included offense instruction on voluntary manslaughter by producing evidence he acted "in a sudden quarrel or heat of passion, caused by adequate provocation." *See* 9th Cir. Crim. Jury Instr. No. 8.109. Lewis's statements might support heat of passion or sudden quarrel, but "[p]rovocation, in order to be adequate, must be such as might arouse a reasonable and ordinary person to kill someone." *Id.*

Lewis's own statements, as well as his attempt to conceal the body, seriously undermined self-defense, adequate provocation, and the reasonableness of his response. Lewis repeatedly said he "overreacted" and did not believe he was in danger of death or serious bodily injury. His injuries appeared minimal. Lewis

---

[6] Medical records disclosed to defense counsel in discovery indicated that Lewis went to the emergency room on April 26, 2011, following an altercation. *See* ER Record, Bates 337-48.

and Boyd were the same height, but Lewis was 40 pounds heavier. *See* First Lewis Interview Jan. 11, 2014, WS_10001, at 32:40-32:46; Bennett Report, Bates 1186. Even assuming Boyd actually posed a threat to Lewis, the number of stab wounds, their depth, and their clustering in Boyd's back all tended to negate the reasonableness of Lewis's response.

In addition, an attempt on Lewis's part to pursue either self-defense or voluntary manslaughter might have opened the door to evidence that Lewis previously engaged in aggressive and/or sexually assaultive behavior toward several boys or young men. In one instance, documented by court records, Lewis stabbed the victim in the back. Similar to his account in this case, Lewis told agents that he and the victim were facing each other when Lewis stabbed him and also told agents about an unidentified man who came to his house. *See, e.g.*, FBI 302 re: Wixon, Bates 16; Bemer, Bates 846; Lewis, Bates 850-51.

While this evidence might not have been admissible in the United States' case-in-chief, at least some of it probably would have been admissible to allow the prosecution to respond to a self-defense theory or to rebut defense evidence supporting voluntary manslaughter. *See, e.g.*, Fed. R. Evid. 404(a)(2)(C) and FBI Interviews, Bates 33-34 (witnesses describe Boyd's reputation as nice, calm, passive, and quiet); Fed. R. Evid. 404(b)(2) (referring to proof of motive and intent) and FBI 302 Reports re: Blount, Bates 23; Bird, Bates 38; B. Johnson,

Bates 45; "Witness A," Bates 488; "Witness B," Bates 636-37 (witnesses describe prior instances of physical or sexual aggression by Lewis).[7]

Turning now to Lewis's latest theories, first, he claims Boyd had "help." Lewis says, "According to discovery . . . Armon returned to my house at approximately 4am." He asks, "Who is the person who saw Armon at my residence? Where was Armon between 1:30am and 4am?" Supp. (Doc. 79) at 2. Lewis also contends that the photographs of his own injuries "show that I was clearly in a struggle. Why doesn't Armon have injuries of the same nature? Was it because he had help?" *Id.*

The time of Boyd's return to Lewis's house came from Lewis. He said Boyd returned at 3:46 a.m. If Boyd "had help," Lewis knew it at least by 3:46 a.m. on January 10, 2014, so it is hard to imagine why he did not mention this fact in one of his two recorded interviews. A reasonable juror would likely infer that Lewis did not mention the "help" because Boyd was alone with Lewis.[8] Further, even if Boyd did not return to Lewis's house until 3:46 a.m., there is no reason to suppose defense counsel could have discovered that, before then, Boyd was with someone or doing something relevant to his later death at Lewis's hands.

---

[7] These witnesses' names were known to the United States and defense counsel.

[8] A reasonable juror might also infer that Boyd did not have injuries similar to Lewis's (for example, on his knees) because the fight Lewis described did not occur. Lewis might have received his wounds as Boyd attempted to defend himself against the knife or as he undressed Boyd's body, moved him, tried to dismember him, or cleaned up.

Lewis also now asserts the knife he used to kill Boyd belonged to his neighbor and another knife, with a wooden handle, belonged to one of Boyd's brothers. Lewis claims Boyd took it with him when he left Lewis's house on Thursday night. "[W]hy," he asks rhetorically, "were those knives at my house?" With these allegations, Lewis attempts to suggest that Boyd (and perhaps Lewis's neighbor or another unidentified person) came to Lewis's house in the early morning hours armed with a knife. *See* Supp. (Doc. 81) at 1-2.

This new theory that Boyd had a knife is contradicted by Lewis's repeated statements that he overreacted and did not believe Boyd might kill or seriously injure him. If Lewis knew Boyd had a knife, or knew yet another unidentified person came to his house that night, he would have had to explain to a jury why he both tried to conceal Boyd's body and failed to mention these facts to Martell, or Bets His Medicine, or Trottier, or Golob.

Perhaps, at the time he spoke with the officers, Lewis was not aware that Boyd had brought the wooden-handled knife into his house. But if that is so, someone other than Boyd and Lewis found it and put it in the same second drawer of the same dresser in the same bedroom where Lewis told officers the murder weapon would be found. Other than his own say-so, Lewis has never described or pointed to evidence supporting an inference that anyone else was present. Trace evidence did not support the theory that a third person was actively involved in the

murder or its aftermath.

Finally, Lewis's claim that counsel said the judge would not allow him to withdraw his plea was an accurate statement of the law. Lewis's guilty plea was accepted when he made it. *See* Fed. R. Crim. P. 11(d)(1); Change of Plea Tr. (Doc. 69) at 37:19-38:21. Neither his allegations nor the record nor the discovery suggest he had a "fair and just reason" for withdrawing his plea before sentencing. *See* Fed. R. Crim. P. 11(d)(2).

Even assuming the (extremely unlikely) facts Lewis now alleges are true, Claims 1 and 3 do not require the Court to decide whether one set of facts or another was true. The question is whether counsel provided ineffective assistance in his representation of Lewis in 2014. Counsel had to work with the framework established by Lewis's three voluntary, detailed statements. They made it extremely unlikely that a reasonable juror would credit later inconsistent statements by Lewis about what happened. Pursuing self-defense or a lesser-included offense of voluntary manslaughter likely would have opened the door to evidence capable of persuading the jury Lewis was guilty of first-degree murder. And Lewis had no other realistic defense to second-degree murder.

In light of the record of the case and discovery produced to defense counsel, Lewis's allegations do not support an inference that counsel's performance was unreasonable or that there is a reasonable probability Lewis would have been

acquitted or convicted of a lesser offense if counsel had done something differently. Neither prong of the *Strickland* test is met. Claims 1 and 3 are denied.

## B. Claim 5

In Claim 5, Lewis alleges that he pled guilty because counsel told him that if he went to trial, the prosecutor would indict Lewis's sister, Pauline, for aiding and abetting. Because Lewis says he later "learned this was not true," *see* Reply (Doc. 78) at 1, the claim alleges ineffective assistance of counsel, not prosecutorial misconduct.

Lewis's allegations are far from clear. He does not say how he learned that what counsel told him was not true, so it possible counsel was correct and Lewis's reason for believing him wrong is incorrect. (For instance, Pauline would not necessarily know whether a case against her was seriously pursued.) Even if counsel was incorrect, his advice still might have been reasonable. He might have believed the prosecution had evidence it did not have, or could yet find evidence it had not found, or would likely realize something detrimental to Lewis or Pauline in preparation for trial. Since it is only possible to aid and abet an offense before it is completed, counsel might have advised Lewis that a trial could lead, for instance, to a charge of evidence tampering. *See, e.g.*, FBI 302 re: P. Lewis, Bates 25 (observing that Pauline had "moved into the residence and re-arranged it to suit her family"). Or counsel might have told Lewis that if he testified at trial, he would be

required to give truthful answers to questions from the prosecutor. No doubt these questions would address "the man" who helped Lewis clean up, and truthful answers might legitimately lead to a charge of accessory after the fact against anyone who actually did help Lewis clean up. *See* 18 U.S.C. § 3.

Nonetheless, it would be unreasonable for counsel knowingly to lie to a client to induce the client to plead guilty. Assuming that is what Lewis is trying to allege, his allegations meet the first prong of the *Strickland* test. But he must still show a reasonable probability he would have gone to trial if he had received professionally reasonable advice. The allegation that Lewis ultimately based his personal decision to plead guilty on a perceived need to protect Pauline does not mean competent counsel would have recommended he proceed to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59-60 (1985). As explained above, pursuing self-defense or voluntary manslaughter would have made conviction for first-degree murder a more realistic possibility. If convicted of first-degree murder, Lewis would have been sentenced to life in prison. *See* 18 U.S.C. § 1111(b). If convicted of second-degree murder following trial, his advisory guideline range likely would have been 235 to 293 months, two to five years over the likely range of 168 to 210 months that applied with a guilty plea. And, given Lewis's detailed confessions, there was no prospect of winning at trial with a reasonable-doubt defense.

The Court can only conclude that no reasonable person in Lewis's position

would have chosen to stand trial. The second prong of the *Strickland* test is not met. Claim 5 is denied.

## V. Motion for Counsel

Because Lewis rejected the Court's previous offer to appoint new counsel, the Court instead ordered the United States to file the discovery. Review of the discovery settles the remaining claims. There is no need to appoint new counsel.

## VI. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Three of Lewis's claims were denied on September 28, 2016. *See* Order (Doc. 67) at 7-9. Lewis was not entitled to grand jury transcripts because he did not go to trial. *See* 18 U.S.C. § 3500(a), (e)(3). There is no reason to believe the judge who presided at sentencing should have anticipated that the prosecutor was

about to refer to Lewis's juvenile record. And while stabbing a person 19 times is not the act of a mentally healthy man, neither Lewis's allegations nor any references in the record suggest he was unable to appreciate the nature and quality or wrongfulness of his actions or was incompetent to stand trial. *See* 18 U.S.C. §§ 17(a), 4241(a). Reasonable jurists would not find room to debate these issues.

Lewis's other three claims are denied in this Order, following a review of the discovery produced to defense counsel before trial. The course of the investigation of the case began with a single street in Brockton, Montana, and essentially concluded with multiple, detailed, recorded confessions by Lewis, all in the space of a few hours. The discovery also included records, reports, and statements by persons with knowledge of physically and/or sexually aggressive conduct by Lewis in the past, including but not limited to a prior incident of stabbing a boy in the back. Trial likely would have opened the door to admission of at least some of that evidence to allow the prosecution to respond to any claim of self-defense or evidence supporting voluntary manslaughter, and that evidence would have made conviction on the first-degree murder charge significantly more likely. At the same time, Lewis had no reasonable-doubt defense to the second-degree murder charge. It was not unreasonable for counsel to fail to pursue self-defense or a lesser-included offense, because there was no reasonable probability of success. As for Lewis's claim regarding counsel's description of a prosecutorial

"threat" to his sister, even setting aside all the ways that counsel's performance could have been reasonable, no reasonable person in Lewis's position would have taken this case to trial. As with Lewis's other claims, no reasonable jurist would find room to debate the resolution of these issues.

A certificate of appealability is not warranted on any claim or issue.

Accordingly, IT IS HEREBY ORDERED:

1. Lewis's motion for the appointment of counsel (Doc. 80) is DENIED.

2. Lewis's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 55, 58, 59, 78, 79, 81) is DENIED;

3. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Lewis files a Notice of Appeal;

4. The Clerk of Court shall ensure that all pending motions in this case and in CV 15-81-GF-DLC are terminated and shall close the civil file by entering judgment in favor of the United States and against Lewis.

DATED this __20th__ day of June, 2018.

Dana L. Christensen, Chief Judge
United States District Court